David M. Roberson and Ethel G. Roberson v. Commissioner. David M. Roberson v. Commissioner.
Roberson v. Commissioner
Docket Nos. 35590, 55996, 55997, 70170.
United States Tax Court
T.C. Memo 1961-1; 1961 Tax Ct. Memo LEXIS 347; 20 T.C.M. (CCH) 1; T.C.M. (RIA) 61001; January 9, 1961
*347 Reconstruction of income: Net-worth method: Fraud: Additions to tax: Burden of proof: Limitations. - 1. Held, that petitioner David M. Roberson was the actual owner and operator of Roberson's Slaughter House during all the taxable years involved; and that the assets, liabilities and income for each of said years are properly attributable to said petitioner. 2. Held, that petitioner David M. Roberson was the partner of Elbert Swain in the business known as R. & S. Packing Company during each of the years 1943 through 1947; and that the stipulated amount of such interest for each year is properly attributable to said petitioner. 3. Held, that the correct net incomes of the petitioners are those determined through use of the so-called net worth method, in the amounts shown on the corrected net worth statement set forth in the Findings of Fact. 4. Held, that at least part of the deficiency for each of the taxable years involved is due to fraud with intent to evade tax; and that an addition to tax under section 293(b) of the 1939 Code should be imposed for each of said years. 5. Held, that the return for each of the taxable years involved was false or fraudulent with intent to *348 evade tax within the meaning of section 276(a) of the 1939 Code; and that assessment and collection of the deficiency and addition to tax for each of said years are not barred by any statutory limitations. Elbert S. Peel, Esq., for the petitioners. Miller Bowen, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in petitioners' income taxes and additions to tax, as follows. [1]
Docket
Additions to tax
No.
Petitioner
Year
Deficiency
Sec. 291(a)
Sec. 293(b)
55996
David and Ethel Roberson
1942
$ 2,144.18
$ 1,072.09
55997
David Roberson
1943
15,994.68
7,997.34
55996
David and Ethel Roberson
1944
4,155.83
$ 174.20
2,077.92
1946
45,628.18
22,814.09
35590
David and Ethel Roberson
1947
45,165.13
2,258.26
22,582.57
70170
David and Ethel Roberson
1949
7,436.34
3,718.17
The cases were consolidated for
trial.
*349 *350 Respondent, by an amendment to his answer filed in Docket No. 55996, claimed that petitioners are liable for a further deficiency and addition to tax for fraud for the year 1942 under section 293(b), in the respective amounts of $3,457.89 and $1,728.95. Respondent also pleaded in the alternative, in Docket No. 55997, that if the Court should determine that no addition to tax under section 293(b) should be imposed for the year 1942 in Docket No. 55996, then petitioner David Roberson's liabilities for deficiency and addition to tax for fraud for 1943, should be increased in the respective amounts of $581.34 and $290.67, pursuant to the provisions of section 6 of the Current Tax Payment Act of 1943. Respondent conceded at the trial that petitioners were not liable for the additions to tax under section 291(a), for failure to file timely returns for the years 1944 and 1947; and, on brief, the respondent further conceded that there are no deficiencies in income tax or additions to tax under section 293(b) due from petitioners for the year 1949, in Docket No. 70170. The issues for decision are: (1) Was petitioner David Roberson the actual owner-proprietor of a business known as Roberson's *351 Slaughter House during each of the years 1942 through 1947? (2) Was petitioner David Roberson a partner in a slaughtering meat-packing business known as R. & S. Packing Company, during each of the years 1943 through 1947? (3) What was the correct net income of the petitioners for each of the taxable years involved, i.e., 1942 through 1944, and 1946 and 1947? (4) Was at least part of any deficiency for each of the taxable years involved, due to fraud with intent to evade tax, so as to render petitioners liable for additions to tax for fraud under section 293(b) for each of said years? (5) Are assessment and collection of the deficiency and addition to tax for each of the taxable years barred by the statute of limitations? An issue raised by petitioner through amendments to the petitions in Docket Nos. 35590 and 55996, concerning the allowance of net operating loss deductions for the years 1946 and 1947, resulting from carrybacks from the years 1948 and 1949, is deemed to have been abandoned, no evidence having been presented at the trial with respect to the same and no arhument relating thereto having been made on brief. Findings of Fact Some of the facts were stipulated. *352 The stipulation of facts is incorporated herein by reference. The petitioners, David M. and Ethel G. Roberson, are husband and wife, residing in Williamston, Martin County, North Carolina. For each of the taxable years 1942, 1944, 1946 and 1947, they filed a joint Federal income tax return with the collector of internal revenue for the district of North Carolina; and for the year 1943, cash filed a separate return with the above-mentioned collector. The petitioners will hereinafter be referred to by their given names, David and Ethel. Ethel was a school teacher during the years involved in these proceedings; and she knew nothing of the business transactions conducted in her name either by her husband, or by the following individuals and business firms: John B. Roberson, Grace Maynard Bazemore, Elbert Swain, Roberson's Slaughter House, R. & S. Packing Company, or Roberson Packing Company, Inc. (each of these persons and firms will be more particularly described hereinafter). Any of Ethel's signatures to any documents involved in this case were placed thereon by her at the request of one or more of the above-mentioned persons and firms. Facts re Roberson's Slaughter House Beginning *353 in the early part of the 1930's, and for several years thereafter, David operated as a proprietor a business known as Roberson's Slaughter House, which was located just outside the city limits of Williamston. In the course of this business, David purchased hogs and cattle from farmers of eastern North Carolina and southern Virginia, who lived in the area in and around Williamston. With regard to some of the livestock so purchased, David acted as a broker, and in turn sold the animals to other meat packers. David slaughtered the other hogs and cattle purchased, and manufactured sausage and other meat products therefrom. The sausage and meat products were sold by David at wholesale to merchants in a 6-county area in and around Williamston. In 1937, the Slaughter House employed between 25 and 30 persons; and it also had 7 trucks making route deliveries of sausage and meat products. In 1936, an individual named M. L. Nobles, who had been employed by the Slaughter House, obtained a judgment against David, in a lawsuit which grew out of the alleged negligence of the defendant. Shortly after the complaint had been filed in said lawsuit, David purportedly "leased" the Slaughter House to *354 one of his clerical employees. In proceedings supplemental to execution on the judgment, a North Carolina state court entered an Order for Receiver which stated, in part, as follows: the defendant, for the purpose of evading execution issued in said cause, has wrongfully and unlawfully attempted to lease his said property to one H. G. Young, his clerk, and while said business is nominally in the name of H. G. Young, as a matter of fact and in truth, the said H. G. Young is a mere figurehead, working on a salary for the defendant at twenty-five ( $25) a week, all of said business being carried on and operated by the defendant, the defendant drawing a check each week for the salary of said H. G. Young and making all contracts in respect to said business; * * * that said lease was entered into for the wrongful purpose of defeating the plaintiff in the collection of his said judgment; * * *. In May 1937, David filed a voluntary petition in bankruptcy with the United States District Court for the Eastern District of North Carolina, and on the following day he was adjudicated a bankrupt. An operating receiver in bankruptcy was appointed to run the Slaughter House. When the receiver *355 appointed by the bankruptcy court entered upon the performance of his duties, he found that there were no books kept for the Slaughter House business. Thereupon said receiver employed a certified public accountant, who took an inventory of the assets. In the course of such inventory, he determined that during the 4 months preceding the filing of the petition in bankruptcy, David and Ethel had withdrawn approximately $7,600 from the business and had invested the same in various personal assets. Thereafter, the bankruptcy proceeding was dismissed in October 1937, following a composition with creditors. During the course of said bankruptcy proceeding, the accountant employed by the receiver installed a set of books, so that the income and expenses, and assets and liabilities, of the Slaughter House could be determined. The set of books so installed was not maintained by David after the bankruptcy proceeding was terminated. Neither David nor Ethel filed a Federal income tax return, either separately or jointly, for any of the years 1938, 1940 or 1941. David filed a separate return for the year 1939, on which no tax was shown to be due. During the years 1940 and 1941, agents of the *356 Internal Revenue Service conducted an investigation into David's affairs as the proprietor of the Slaughter House, with a view to making an assessment of unjust enrichment tax. In 1940, during the pendency of such investigation, David retained an accountant, Frank P. Meadows, to make an audit of the books and records of the Slaughter House business, in connection with said unjust enrichment tax investigation, and also to prepare and file Federal income tax returns for David and Ethel for the years 1939 and 1940. Meadows found that the books and records of the Slaughter House were so incomplete and insufficient, particularly as regards income from sales, as to preclude the determination of the correct net income of the Slaughter House; and for that reason, Meadows was unable to prepare and file final returns for either David or Ethel. Meadows sought from David information needed to prepare a final return for 1939, but David did not attempt to get such information, nor did he in any other respect effectively cooperate with the accountant Meadows. At the time of Meadows' audit in 1940, such books and records of the Slaughter House as there were, were maintained by or under the supervision *357 of a woman named Grace Whitley Maynard. [2] Meadows suggested to David that a more complete and satisfactory bookkeeping system for the Slaughter House be set up, so that the correct income therefrom could be determined. Pursuant to such suggestion, a young bookkeeper recently graduated from business school was hired to keep the books; and this individual did so in a competent manner for about 6 months. However, he was then discharged. Grace thereupon, sometime in the latter part of 1940, resumed keeping the books of the Slaughter House. In November 1941, an assessment of unjust enrichment tax was made against David in the amount of $16,584.42; and on February 25, 1942, David submitted an offer in compromise to the collector of internal revenue, wherein he proposed to settle such assessed tax liability by payment of $100. In said compromise offer, David listed as his assets various interests in real and personal property, but he did not list any cash on hand. In an affidavit attached to the compromise *358 offer, David swore "that the foregoing list of assets and liabilities as of February 24, 1942 * * * [is] true and complete in every respect and that I have no assets (either directly or indirectly owned) of any nature other than those listed as aforementioned." On July 19, 1941, during the pendency of the above-described investigation relating to the unjust enrichment tax, David and Ethel, entered into a purported "lease" agreement with Grace Maynard and John B. Roberson. [3] Said agreement provided that David and Ethel were to lease the Slaughter House realty with the improvements thereon to Grace and John; and that David was to lease to the same parties, most of the equipment used in connection with the operation of the Slaughter House. The rent under the agreement was fixed at $50 per week; and the term of the "lease" was for 10 years, with either party having the right to cancel on 30 days' written notice. The "lease" contemplated that Grace and John were to operate the Slaughter House. On the same date, and in connection with the execution of the foregoing lease agreement. David executed a bill of sale whereunder he purportedly "sold" 12 trucks to Grace and John, in consideration *359 of their agreement to pay the unpaid installments on the purchase price of said trucks. Also, in accordance with a contemporaneous oral arrangement had between David and Grace and John, David was to remain as the purported "manager" of the Slaughter House, at a salary of $50 per week. Neither Grace nor John made any cash payment to David or Ethel at the time the above-described "lease" and "sale" were entered into. At said time, John did not know the sales or profits of the Slaughter House for prior periods. Following the execution of the above-described lease and bill of sale, Grace and John purportedly became partners in the operation of the Slaughter House. There is no evidence of either an oral or written partnership agreement having been entered into between them; and neither grace nor John made any capital contribution to the "partnership," of which they were the purported members. John had begun working in the shipping department of the Slaughter House in 1938, when he was 18 or 19 years of age, at a salary of 12 1/2 cents per hour. By 1941, *360 when he was assisting the salesmen on their routes, John's wages were approximately $85 per month. Both prior to July 19, 1941, the date of the above-described "lease" and "sale," and thereafter until sometime in the summer of 1942 (when John went into military service), he was listed as an employee on the quarterly social security tax returns filed for the Slaughter House. John continued to receive the same amount from the Slaughter House after he became a "partner" and until he entered military service, as he had prior thereto. John remained in military service from 1942 until January 1946; and during this period all that he received from the operation of the Slaughter House was $1.25 per week which was deposited for credit to his account at a local building and loan association. After John returned from military service in January 1946, he resumed working at the Slaughter House; and from the first quarter of 1947 until July 1949 (when his "partnership" with Grace was terminated, under circumstances presently to be described), he was listed as an employee of the Slaughter House on its social security tax returns. John was given the title of sales manager upon his return from *361 military service. Although he was supposed to be a partner, he continued to draw only a specific salary (at first $50 per week, and thereafter $75 per week), and he made no policy decisions with respect to the Slaughter House. John was not authorized to, and did not, sign any checks on behalf of the Slaughter House; and he did not know at which bank the Slaughter House had a bank account. He was unfamiliar with the books and records of the Slaughter House. John was totally unaware of the amount of money which Grace, his purported "partner," withdrew from the business from 1942 through 1948; and he was not given an accounting for the profits of the Slaughter House, for any year from 1941 through 1947. Grace had begun working at the Slaughter House in 1934 or 1935, when she was 17 years of age. Her starting salary was $6 per week; and at the time of the purported "lease" and "sale" to her and John, as above described, she was being paid a salary of $20 per week. From 1938 until July 1941, Grace was the only person who worked in the office of the Slaughter House, except during the 6-month period in 1940, when the above-mentioned young bookkeeper was hired. Grace's duties included keeping *362 whatever books there were for the Slaughter House. Grace was paid the same amount by the Slaughter House for an unspecified time after the formation of the alleged partnership with John, as she had been paid prior thereto; and she was also listed as an employee of the Slaughter House on its social security tax returns until the third quarter of 1942, when she decided that she would no longer pay social security taxes for herself. Sometime after July 1941, Grace's compensation was increased to $35 per week, and it remained at this amount until May 1945, when it was further increased to $40 per week. Grace's duties with respect to the operation of the Slaughter House after the purported "lease" and "sale" continued to be of a clerical character. She maintained such records as were kept (and these will be more particularly described hereinafter); and she also prepared income tax returns for herself and John, as well as for David and Ethel. In addition, she prepared the partnership information returns and the social security tax returns for the Slaughter House. During the period from July 19, 1941, through the year 1947 (the last of the taxable years involved), David was identified *363 on the letterhead of the Slaughter House, as the "manager" thereof. During said period, David directed the operations of the Slaughter House. He devoted himself largely to buying livestock for the business. David hired and fired employees; and he also supervised the work of Grace and John, and of the salesmen and the other employees. On numerous occasions, when funds were required for operating capital for the Slaughter House, they were borrowed from banks and individual lenders. In these instances, the negotiations for the loans were handled by David; and either he or Ethel, or both, signed notes as makers, or else endorsed notes given in the name of the Slaughter House. Proceeds of such loans were deposited in the Slaughter House account. Also, David would not permit Grace to write letters concerning the Slaughter House business, without his prior consent and directions as to their contents. Moreover. David was not listed as an employee at any time during said 1941-1947 period on social security tax returns filed with respect to that business. In 1946 David offered to sell to an individual named George Peel, a one-half interest in the Slaughter House, and to make Peel a partner *364 with the right to participate in the management of the business and to share in the profits therefrom. As part of the proposed arrangements, Peel (who was not then aware that John was already supposed to be a partner) was to sell one-half of his interest to John. John informed Peel that he was only an employee, and that he did not have the funds to purchase half of the interest which Peel was contemplating acquiring. Peel, however, decided against becoming a partner so long as Grace was connected with the business; and thereupon David offered to have his attorney draw up the necessary instruments to "release" Grace and John from the business. Peel ultimately decided to lend money to David for use in the operations of the Slaughter House. Repayment of principal and interest on this loan were made to Peel by David. During the years from 1944 through 1947, the Slaughter House not only carried on the business of buying and selling cattle and slaughtering cattle and manufacturing meat products, but also engaged in certain farming activities. Initially these farming activities consisted of operating two farms. the Cowan Farm in Martin County, and the Smithson Farm in Washington County. *365 The Cowan Farm had been purchased in 1936 in Ethel's name; and from that date until 1944 said farm was operated by David. In 1944, the Slaughter House "partnership" of Grace and John purportedly leased the Cowan Farm from David, and thereafter operated the same. There were an unspecified number of tenant farmers on the Cowan Farm, who raised tobacco, corn and peanuts. Their operations were overseen by David. The Smithson Farm was originally leased for 10 years by David in 1943 or 1944 from an individual named Clyde Smithson; and shortly thereafter David purportedly assigned his interest in the lease to the Slaughter House "partnership." The chief activity on the Smithson Farm was the growing of beef cattle, of which David had purchased two herds in 1944 totaling 145 head. In 1945, there was purchased in Ethel's name, another Martin County farm known as the Anderson Farm, containing 100 acres. The Anderson Farm, which adjoined the Cowan Farm, also was purportedly leased to the Slaughter House "partnership." It was operated in the same manner as the Cowan Farm. On January 18, 1946, there was purchased from the Farm Security Administration two tracts of land in Washington County, *366 which tracts together contained approximately 414 acres and were known as the Shepherd Farm. The grantee named in the deeds for the Shepherd Farm was "John B. Roberson & Grace Whitley Maynard, trading as Roberson Slaughter House." However, in personal property tax returns filed by David with the tax assessor of Washington County for each of the years 1946 and 1947, he listed the Shepherd Farm as his property. On the same date that the Shepherd Farm was purchased, there was purchased in Ethel's name a farm in Washington County known as Magnolia Farm, consisting of 1,424 acres. On said date David and Ethel also purchased a one-half interest in another farm located in Washington and Tyrell Counties, which was known as the Belgrade Farm and contained 290 acres. The Magnolia Farm and the Belgrade Farm were, like the above-mentioned Cowan Farm, also purportedly leased to the Slaughter House, to be operated by the said "partnership." The above-mentioned farms located in Washington and Tyrell Counties were located near Creswell, North Carolina, and were described on the partnership information returns filed by the Slaughter House as the "Creswell Farms." J. W. Rasor (who owned the remaining *367 one-half of the Belgrade Farm) served as overseer of all the so-called Creswell Farms, under David's direction. The principal activity at these farms was the raising of beef cattle. Sales of cattle from the Creswell Farms for 1946 and 1947, were reported on the Slaughter House partnership returns in the respective amounts of $16,994.09 and $10,552.76. In July 1949, Grace and John executed bills of sale wherein they conveyed their purported interests in the Slaughter House to Roberson Packing Company, Inc., a corporation of which David was the president, for a recited consideration of $10,000. Facts re R. & S. Packing Company In 1938 or 1939, David decided to open a sales branch for the Slaughter House in Raleigh, North Carolina. At that time, David sent one of his long-time employees, Elbert Swain, to take charge of the Raleigh office under an arrangement whereby David would supply the meat products and Swain would sell them. Profits derived from operations at the Raleigh branch were shared by the two men. This arrangement lasted for approximately one year, at which time David and Swain had a disagreement and Swain left David's employment. Sometime thereafter in late 1941 or *368 early 1942, Swain resumed his position as manager of the Raleigh branch. The discussions and negotiations attendant upon such reemployment were conducted by and between Swain and David, and not between the former and Grace and John (who at that time were purported to be the "partners" operating the Slaughter House). Swain continued as manager of the Raleigh branch until early in 1943. At that time, Swain and David had negotiations looking to the formation of a partnership for the conduct of the business then being conducted at the Raleigh branch. The partners were to be Swain and David in the latter's capacity as "proprietor" of the Slaughter House. Such partnership was formed, with Swain contributing capital of $5,000 in cash, and David contributing capital of $15,000, partly in cash and partly in merchandise, sundry supplies and office equipment then located at the Raleigh branch. Swain was to be the managing partner. The profit-and-loss-sharing arrangements were as follows: Swain was to receive three-eighths of the profits (of which one-eighth was in the nature of salary for his services in managing the business); and David was to receive the remaining five-eighths. The name of *369 the partnership (derived from the initial letters of the names of the partners, Roberson and Swain) was the R. & S. Packing Company (hereinafter called "R. & S."). At some undisclosed time following the formation of R. & S., Swain for the first time learned that his partner was supposed to be, not David as the proprietor of the Slaughter House, but Grace and John in their capacity as "partners" in the operation of the Slaughter House. Swain nevertheless continued to consider David as his partner, and all of his dealings relating to the operations and financing of R. & S. were had with David. John was not familiar with the operations at the Raleigh branch, at the time he and Grace executed the above-mentioned "lease" and "sale" of the Slaughter House property in July 1941. As hereinabove found, he did not participate in the negotiations with Swain at the time when the latter returned to the employment of the Slaughter House in 1941 or 1942; nor did he sign any partnership agreement with Swain when R. & S. was formed in 1943. After John returned from military service in 1946, he was not aware of, nor did he seek to ascertain, the sales volume of R. & S., or whether it was realizing *370 any profit; nor did he discuss the operations at Raleigh with Swain. Also, John did not participate in the negotiations (hereinafter mentioned) with Swain in 1948, resulting in the purchase by Swain of the interest of his partner in R. & S. Grace was more familiar with the operations at Raleigh than was John. She set up the books of account for R. & S., and instructed the bookkeeper regarding the manner of keeping the books. She filled out the partnership information returns for R. & S., based upon information supplied by said bookkeeper or by Swain. However. Grace did not participate in, nor was she consulted with regard to, the management of the R. & S. business. Prior to the formation of R. & S. and for a period of three or four months thereafter, the business conducted at Raleigh consisted of selling meat products that had been manufactured at the Slaughter House plant in Williamston. In the summer of 1943, the city abbatoir (a public slaughterhouse, maintained and operated by the City of Raleigh) became available for purchase. Swain and David decided to purchase this property; use it as the site for conducting the R. & S. operations; and expand the business of R. & S. to include *371 the purchase, sale, and slaughter of livestock, and the manufacture of sausage and other meat products. The purchase price (the exact amount of which is not fixed by the record) was paid, one-fourth by Swain and three-fourths by David and/or Ethel. Title to the property was taken in the name of Swain and Ethel. Periodically, at least once each year, Swain transmitted to David a statement containing the assets, liabilities and net worth of R. & S., whereon the increases in the net worth of that business during each said period were described in such terms as "net gain" or "net profit" for the particular period. The following table shows the net profit for the several periods covered in Swain's reports to David: May 8, 1943, to Jan. 1, 1944
$ 14,137.53
Jan. 1, 1944, to July 15, 1944
13,147.62
July 15, 1944, to Jan. 1, 1945
33,450.63
Jan. 1, 1945, to Jan. 1, 1946
42,234.74
Jan. 1, 1946, to Jan. 1, 1947
58,469.67
Jan. 1, 1947, to Jan. 1, 1948
29,725.04
Jan. 1, 1948, to July 10, 1948
19,998.23
Total
$211,163.46
The bulk of such profits were invested in additional equipment and facilities for R. & S. Partnership information returns for R. & S. were, as *372 hereinabove found, prepared by Grace for each of the years 1943 through 1948. The net income of R. & S. was reported on such returns for each of the years 1943 through 1947, as follows: Year
Amount
1943
$ 8,679.63
1944
8,489.02
1945
15,116.84
1946
49,718.94
1947
1,077.84
Total
$83,082.27
On or about May 1, 1947, Swain received a letter signed by Grace and dated April 29, 1947, in which the following statement appears: Now please keep your records so they don't show so d much profit this year. No fun paying it to the Government. A postscript signed by David was appended to the above-mentioned letter, in which the following appears: I don't want you to feel like we are trying to press you or dictate to you, but after all, it is pretty poor policy on our part to pay both interest and income tax. * * * Fifteen thousand dollars tax is a lot and I want you and Miss Marsh [the bookkeeper at R. & S.] to begin now and don't let it be that much for this year. I think this is going to be a pretty tight year and you probably won't have much trouble keeping your profits down. On or about April 15, 1949, Swain received a letter signed by Grace, in which *373 the following statement appears: Watch your step now. I have the taxes ready to mail for the first part of the year. Any time your man wants to know anything about them he cannot understand, tell him to call me personally. At an undisclosed date subsequent to January 1, 1948, and prior to July 10, 1948, David attempted to borrow money from a bank in Raleigh. In connection therewith, he submitted financial statements to said bank, on one of which he listed among his assets as of January 1, 1948, a "3/4 Interest In R. & S. Packing Co. $74,630.20." In another financial statement submitted at the same time, captioned "Net Worth of D. M. & Ethel G. Roberson, List of Real Estate Owned," David listed a "3/4 Interest R. & S. Packing Co. & Cold Storage $119,463.02." In 1948, due to a disagreement between Swain and David, Swain began negotiations with David, for the purpose of having David buy Swain's interest in R. & S. David was unwilling to make such a purchase; but instead he countered with an offer to sell his interest in the inventory, good will, and other nontangible assets of R. & S. to Swain for $50,000. Swain accepted David's offer, and the purchase transaction was consummated *374 on July 10, 1948. A down payment of $30,000 in cash was made at the time of the sale, and the balance of $20,000 was paid in cash and merchandise in a series of installments later in the year 1948. All payments of money made by Swain in connection with said purchase, were paid by checks drawn payable to the order of the Slaughter House, which were deposited in its bank account. In the course of the above-described purchase negotiations, David proposed that Swain purchase for $180,000, the interest in the real estate and other fixed assets of R. & S. that then stood in Ethel's name. David requested that Swain pay him a portion of such selling price "under the table," so that he and Ethel would not be required to pay income tax thereon. Swain rejected David's proposal, for the reason that he "just didn't want to get involved in that type of deal." Facts re David's Other Activities In addition to his activities in connection with the Slaughter House and R. & S., David engaged in other activities during the years 1942 through 1947. As hereinabove found, he farmed the land known as the Cowan Farm in his individual capacity in 1942 and 1943. Also during said years, he engaged in farming *375 activities on land which was part of the tract on which his and Ethel's personal residence was located. In December 1943, there was purchased in Ethel's name a 167-acre farm in Martin County, known as the Blount Farm. During the years 1944 through 1947, David engaged in the operation of this farm in his individual capacity. Also in connection with his farming activities, the following table shows the number of breeding cattle purchased by David and/or Ethel, which were kept on the previously mentioned Creswell Farms: Number of cattle
Year
purchased
1944
145
1945
76
1946
161
Another income-producing activity engaged in by David was the subdivision of property, and the sale of lots therefrom. In December 1945, David employed a surveyor to plat a portion of the above-mentioned Cowan Farm into a residential subdivision containing two blocks of 7 lots each. In 1945 he sold 2 of said lots in 2 sales; and in 1946, he sold 8 of said lots in 7 sales. In 1946, David had the same surveyor plat a portion of the above-mentioned Anderson Farm (said portion being known as the Bowers Farm), into a residential subdivision. In 1946 David sold 3 of said lots in 3 sales; and *376 in the following year, 1947, he sold 10 such lots in 8 sales. The amounts of all such sales are hereinafter set forth. Facts re Books and Records There was at no time any general ledger containing the accounts of the Slaughter House. The only book of account maintained for said business was a journal containing, on a daily basis, some but not all of the cash receipts and disbursements of the Slaughter House. The journal was divided into a series of vertical columns in which were entered bank deposits and withdrawals; cash receipts and disbursements outside the bank account; sales of cattle and merchandise; purchases of cattle and manufacturing supplies; various expenses such as salaries, repairs, interest, and taxes; and purchases of fixed assets. With regard to cash receipts from sales there was no indication in the journal as to the identity of any vendee; and with regard to cash disbursements, there was no indication as to whom payment had been made. At the time when the agents of the respondent conducted their investigation of the income tax returns of David and Ethel and the partnership returns of the Slaughter House, there were no invoices or cancelled checks to identify *377 and support the cash disbursements; no bank statements; and no duplicate sales invoices or other records, against which a check of the sales figures in the Slaughter House journal could be made. In addition to the transactions involving the Slaughter House which were reflected in the above-mentioned journal, there were also columns therein provided for income and expense items, not only of (a) those farms (Cowan, Anderson, Magnolia, and Belgrade) which were purportedly leased from David, but also of (b) the Smithson Farm which the Slaughter House leased directly from Clyde Smithson, (c) the Shepherd Farm which had been purchased in the name of Grace and John as partners in the Slaughter House, and (d) the Blount Farm which David was farming in his individual capacity. As regards all the farms in Washington and Tyrell Counties - the four so-called Creswell Farms - the income and expense items connected therewith were all entered in a single pair of columns captioned "Smithson In" and "Smithson Out." There was no breakdown of the items relating to each particular farm in the group. Also, expenditures for fixed assets were recorded in the same column with current operating expenses. *378 At the end of each taxable year Grace, who as above found, prepared the partnership information returns for the Slaughter House, went through the entries in the journal for such year; culled out those which she believed to be personal and capital items among the expenditures; and prepared "recap" sheets of the remaining expenses for inclusion on the returns. Grace was assisted in the preparation of such returns by Ethel's brother, James Griffin, who was a merchant and farmer in the Williamston community. Griffin did not attempt to audit or balance the Slaughter House journal; nor did he even inspect said journal. Griffin's assistance consisted solely in determining where on the returns, the figures assembled and supplied by Grace should be placed. The respondent's agents computed the income of the Slaughter House for the period from 1942 through 1947, by use of the so-called net worth method. The following is a correct statement of the assets, liabilities, and net worth of the Slaughter House as of December 31 of each of the years 1941 through 1947: Roberson Slaughter House
12/31/41
12/31/42
12/31/43
12/31/44
ASSETS
Cash on hand or in
banks
$ 794.43
$ 51.39
$ 199.23
$ 1,294.23
Martin County Build-
ing & Loan Shares
450.00
1,230.00
Accounts Receivable
10,730.46
Inventory
12,639.54
7,427.54
11,367.78
1,237.66
Office Equipment -
Furniture & Fix-
tures
657.00
657.00
657.00
657.00
Automobiles &
Trucks
8,264.23
10,636.85
7,643.70
7,643.70
Equipment & Horses
Cattle
Assets at Raleigh
Branch
8,383.21
16,327.14
Real Estate
Farm Equipment
1,833.42
Total Assets
$41,468.87
$35,099.92
$20,317.71
$13,896.01
LIABILITIES
Notes and Mortgages
Payable
$ 1,026.34
Trade Accounts Pay-
able
13,744.87
$ 817.77
Overdrafts
11,898.13
Reserves for Depre-
ciation
3,651.33
6,376.24
$ 5,254.33
$ 6,973.47
Total Liabilities
$30,320.67
$ 7,194.01
$ 5,254.33
$ 6,973.47
Net Worth
$11,148.20
$27,905.91
$15,063.38
$ 6,922.54
*379 Roberson Slaughter House
12/31/45
12/31/46
12/31/47
ASSETS
Cash on hand or in
banks
$ 595.89
$ 7,137.93
$ 2.55
Martin County Build-
ing & Loan Shares
2,010.00
1,890.00
1,760.00
Accounts Receivable
22,280.08
6,880.67
15,081.90
Inventory
11,659.81
9,820.33
16,440.81
Office Equipment -
Furniture & Fix-
tures
657.00
957.00
957.00
Automobiles &
Trucks
7,643.70
8,498.70
12,618.44
Equipment & Horses
1,068.00
Cattle
13,131.19
30,516.30
34,305.23
Assets at Raleigh
Branch
Real Estate
16,000.00
35,625.00
Farm Equipment
6,898.42
14,727.42
32,281.22
Total Assets
$64,876.09
$96,428.35
$150,140.15
LIABILITIES
Notes and Mortgages
Payable
$14,340.00
$ 29,390.69
Trade Accounts Pay-
able
$11,858.81
12,660.14
37,869.44
Overdrafts
Reserves for Depre-
ciation
8,414.57
6,674.86
9,001.51
Total Liabilities
$20,273.38
$33,675.00
$ 76,261.64
Net Worth
$44,602.71
$62,753.35
$ 73,878.51
With respect to R. & S., the parties have stipulated as follows: 4. Regarding the notices of deficiency issued in these proceedings, there is an asset item on the net worth schedules entitled, "Net interest in R and *380 S Packing Company," in amounts as follows: 12/31/43
$ 42,168.00
12/31/44
60,226.40
12/31/45
108,153.76
12/31/46
154,285.39
12/31/47
160,363.81
The parties agree that if this Court determines that either Ethel or David M. Roberson had any interest in R and S Packing Company during these years that the above figures are to be included in their net worth schedules as an asset entitled, "Net interest in R and S Packing Company." Neither David nor Ethel maintained any books and records relating to their individual income-producing activities, such as farming and the subdivision and sale of lots. The only records relating to David's farming activities were such as appeared in the journal of the Slaughter House, as above described. David maintained no bank account of his own; but he used the Slaughter House bank account, as to which it is not possible to segregate his individual transactions. The respondent's agents computed the income of David and Ethel by use of the net worth method. The following is a correct statement of the assets, liabilities, and net worth, of David and Ethel as of the end of each of the years 1941 through 1947; and also of the increases *381 in net worth, nondeductible expenditures, certain nontaxable receipts, and net income, of David and Ethel for each of said years except 1945, which is not involved in the instant case: David M. Roberson and Ethel G. Roberson
12/31/41
12/31/42
12/31/43
12/31/44
ASSETS
Guarantee Bank &
Trust Co. (Ethel)
$ 367.18
$ 1,336.27
$ 110.25
$ 781.17
United States Savings
Bonds
225.00
1,893.75
2,643.75
Mortgages Receivable
5,000.00
4,000.00
Martin County Building
& Loan Shares
4,005.00
4,492.50
1,180.00
2,280.00
Equity in Construction
Loan and Paid Con-
struction - Martin
County Building &
Loan
Equipment other than
on Farms
7,990.00
7,990.00
7,990.00
7,990.00
Real Estate and Farms
Martin County
47,042.50
46,992.50
57,142.50
51,067.50
Washington County
Deposit on Farms
Cattle (breeding herd)
10,513.70
Farm Equipment -
Blount Farm
2,375.00
Interest in R. & S.
Packing Co.
42,168.00
60,226.40
Interest in Roberson's
Slaughter House (as
shown in preceding
net worth statement)
11,148.20
27,905.91
15,063.38
6,922.54
Total Assets
$70,552.88
$88,942.18
$130,547.88
$148,800.06
LIABILITIES
Mortgages and Notes
Payable
$28,559.00
$29,020.00
$ 39,163.20
$ 52,570.13
Reserves for Deprecia-
tion
12,118.00
14,127.00
13,836.00
16,583.96
Total Liabilities & De-
preciation Reserves
$40,677.00
$43,147.00
$ 52,999.20
$ 69,154.09
Net Worth
$29,875.88
$45,795.18
$ 77,548.68
$ 79,645.97
Increase in Net Worth
$15,919.30
$ 31,753.50
$ 2,097.29
Add: Nondeductible Expenditures
Federal Income Taxes Paid
None
448.23
1,692.87
Living Expenses
4,000.00
4,000.00
4,000.00
Subtotal
$19,919.30
$ 36,201.73
$ 7,790.16
Less: Inheritance of Ethel in 1947
Deduction included in Living
Expenses
650.06
415.14
490.67
Ethel's Salary for 1943
1,081.00
Net Income
$19,269.24
$ 34,705.59
$ 7,299.49
*382 David M. Roberson and Ethel G. Roberson
12/31/45
12/31/46
12/31/47
ASSETS
Guarantee Bank &
Trust Co. (Ethel)
$ 1,316.48
$ 2,249.88
$ 2,885.31
United States Savings
Bonds
2,643.75
2,643.75
2,643.75
Mortgages Receivable
Martin County Building
& Loan Shares
600.00
Equity in Construction
Loan and Paid Con-
struction - Martin
County Building &
Loan
3,762.51
Equipment other than
on Farms
8,045.00
10,320.00
12,820.00
Real Estate and Farms
Martin County
73,000.83
72,941.03
77,430.33
Washington County
47,000.00
46,000.00
Deposit on Farms
23,334.00
Cattle (breeding herd)
16,168.83
24,717.83
24,717.83
Farm Equipment -
Blount Farm
3,275.00
3,618.50
3,861.25
Interest in R. & S.
Packing Co.
108,153.76
154,285.39
160,363.81
Interest in Roberson's
Slaughter House (as
shown in preceding
net worth statement)
44,602.71
62,753.35
73,878.51
Total Assets
$280,540.36
$380,529.73
$408,963.30
LIABILITIES
Mortgages and Notes
Payable
$ 82,146.73
$106,075.40
$116,273.15
Reserves for Deprecia-
tion
21,461.52
29,010.38
38,025.54
Total Liabilities & De-
preciation Reserves
$103,608.25
$135,085.78
$154,298.69
Net Worth
$176,932.11
$245,443.95
$254,664.61
Increase in Net Worth
$ 97,286.14
$ 68,511.84
$ 9,220.66
Add: Nondeductible Expenditures
Federal Income Taxes Paid
*
391.59
62.50
Living Expenses
*
5,000.00
5,000.00
Subtotal
$ 73,903.63
$ 14,283.16
Less: Inheritance of Ethel in 1947
600.00
Deduction included in Living
Expenses
*
497.18
None
Ethel's Salary for 1943
*
Net Income
$ 73,406.25
$ 13,683.16
*383 David and Ethel reported the following amounts of net income on the Federal income tax returns filed by them for the years 1942 through 1944, and 1946 and 1947: 1942
$ 3,569.94
1943 (David only)
3,847.96
1943 (Ethel only)
3,000.35
1944
2,616.18
1946
4,925.70
1947
2,328.93
Total
$20,289.06
During the respondent's investigation of David's income tax affairs, Grace refused to make available any of the records of the Slaughter House; and in such refusal Grace admittedly was acting pursuant to David's instructions. The above-described journal of the Slaughter House for the years 1944 to the middle of 1948 finally was made available, only after the respondent had issued a subpoena therefor, and had obtained enforcement of such subpoena through two orders of a Federal District Court. During the years 1946 and 1947, David on a number of occasions drew drafts on R. & S. for funds for his personal use or for use of the Slaughter House; and on at least one occasion, R. & S. paid a personal note for David at *384 a Raleigh bank. On some of these occasions when R. & S. honored drafts drawn against it, the transactions were entered on its books as purchases or expenses; and deductions for such items were then claimed on its partnership information returns. On some of such other occasions, the amounts were repaid to R. & S. by the Slaughter House; and they then were charged on the latter's journal as expenses, and were deducted on its information returns. The result of all these above-mentioned transactions during the years 1946 and 1947, was an overstatement of expenses by either the Slaughter House or R. & S., in the respective total amounts for said years of $38,691.69 and $29,196.38. Grace, who handled these transactions, was aware that they involved the "kiting" of checks of said two corporations; and that, in connection therewith, false entries were made in the Slaughter House journal. As hereinabove found, David subdivided the Bowers Farm and the Cowen Farm and sold lots therefrom in 1946 and 1947. David also made sales of real estate in the years 1942, 1943, and 1944. The total dollar amount of the sales for each of the foregoing years is as follows: 1942
$ 350
1943
10,200
1944
300
1946
5,300
1947
2,600
*385 None of these sales were reported in David's or Ethel's tax returns for any of the years involved. Also, in 1946, David sold 12 houses from Magnolia Farm at $1,000 each. Grace was aware that the sale of these houses should have been reported on David's income tax returns, but they were not so reported. David and Ethel also failed to report certain interest income on their income tax returns. In 1944, David received $649.47 interest from an individual named Bullock; but the receipt of this interest was not reported on the joint return filed by David and Ethel for said year. Also, during the entire period 1942 through 1947, the Slaughter House paid Ethel $15 per week - such payments being characterized in the Slaughter House journal as "interest." None of this "interest" was ever reported on Ethel's or David's income tax returns. Ultimate Facts The books and records maintained for Roberson's Slaughter House were incomplete and inadequate; and they do not clearly reflect the income of said business for any of the taxable years here involved. No books or records whatever were maintained by David or Ethel, to reflect their miscellaneous transactions or income for any of the years *386 involved. The business known as Roberson's Slaughter House was actually owned and operated by David Roberson, individually, during all years here involved. The purported "lease" and "sale" transactions of July 1941, relating to said business, were sham transactions; and the alleged partnership of Grace and John in said business, also was a sham. David was the partner of Swain in R. & S. Packing Company, during the period from 1943 through 1947. At least part of the deficiency for each of the years 1942 through 1944, and 1946 and 1947, is due to fraud with intent to evade tax. The fraud for all of said years was that of David. The joint Federal income tax return filed by David and Ethel for each of the years 1942, 1944, 1946 and 1947, and also the individual return filed by David for 1943, were false or fraudulent with intent to evade tax. Opinion All of the issues here presented for decision involve, primarily, questions of fact. The burden of proving fraud, which concededly is a prerequisite to avoiding the bar of the statute of limitations for all years involved, was on the respondent. *387 Section 1112 of the 1939 Code. The pertinent facts as to each issue, that have been established by the evidence, have hereinabove been set forth in considerable detail in our Findings of Fact; and we believe that no useful purpose would be served by here making any extended review of the same. As to all issues we have carefully examined and analyzed all the relevant evidence as to each, including the stipulation, the testimony, and the numerous exhibits. And after hearing each of the witnesses testify, observing their demeanor, and analyzing their testimony in relation to the other evidence, we have determined what appropriate weight and credibility should be accorded to the statements of each. The petitioner David did not testify, notwithstanding that he was present in the courtroom throughout the trial. The petitioner Ethel was at no time present in the courtroom. As to the several persons who did testify, we regard the testimony of all except two to be credible. These two exceptions are John Roberson and Grace Maynard Bazemore. As to each of these, we regard certain portions of their testimony which are inconsistent with our Findings of Fact, to be evasive or incredible, and *388 not worthy of belief. Based on all the foregoing, our holdings as to the five issues presented for decision, which are all in accordance with our Findings of Fact, are as follows: 1. The first issue is whether petitioner David M. Roberson was the actual owner of Roberson's Slaughter House during each of the taxable years involved. We hold as to this, that said question must be and is answered in the affirmative; and accordingly that the assets, liabilities and income of said business for each of such years are properly attributable to said petitioner. 2. The second issue is whether said petitioner David M. Roberson was the partner of Elbert Swain, in the business known as R. & S. Packing Company, during each of the years 1943 through 1947. We hold as to this, that such question also should be and is answered in the affirmative; and that in accordance with the stipulation of facts filed herein, the amount of David's interest in said partnership during each of such years is that set forth in said stipulation of facts, and also as set forth in our own Findings of Fact. 3. The third issue pertains to the amounts of the correct net income of David and Ethel Roberson for each of *389 the taxable years involved. We have hereinabove in our Findings of Fact set forth a corrected net worth statement in respect of said petitioners, which shows the amounts of such net incomes. We here hold that the amounts of net income so found are the correct amounts, and that the same are to be used in computing the tax liabilities of said petitioners for the several taxable years here involved. 4. The fourth issue is whether at least part of the deficiency for each of the taxable years is due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code. We are convinced beyond any reasonable doubt that such question should be, and it is hereby, answered in the affirmative; and we hold that an addition to tax should be imposed under section 293(b) for each of said years. In reaching this conclusion, we have relied only upon the affirmative proof of record, and not upon any presumption as to the correctness of the respondent's determinations. We are satisfied that the respondent has amply borne his burden of proof as to this issue. 5. The fifth and final issue is, whether the return for each of the several taxable years involved, was false or fraudulent *390 with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. We hold that this question also should be, and it is hereby, answered in the affirmative; and that assessment and collection of the deficiency and addition to tax for each of said years, are not barred by any statutory limitations. Decisions will be entered under Rule 50. Footnotes
1. In addition to the liabilities above shown, the respondent determined a deficiency and an addition to tax under section 293(b) against Ethel Roberson for the year 1943, in which year she and her husband filed separate returns; and she filed a petition with respect thereto, under Docket No. 70169. During the course of the trial herein, this Court, acting pursuant to an uncontested motion of the respondent, entered a decision in the case bearing said Docket No., to the effect that there was no deficiency, no overpayment, and no addition to tax due from Ethel for said year. This action was taken by reason of a written stipulation of facts filed herein to the effect that any increase in the net worth of Ethel and her husband David for the year 1943, which might be determined in the present proceedings, was a net worth increase of David and not of Ethel; and that any fraud for the year 1943 which might be determined in the present proceedings was the fraud of David and not of Ethel. As regards the year 1945, the petitioners did not file a petition with respect to the notice of deficiency; and accordingly the tax liabilities for said year are not before us. As regards the year 1948, no deficiency was determined by respondent with respect to said year.↩
2. Grace Maynard has since remarried; and at the time of the trial herein, her name was Grace Whitley Maynard Bazemore. She is referred to hereinafter by her given name, Grace.↩
3. John B. Roberson is the first cousin of petitioner David Roberson. He is hereinafter referred to by his given name, John.↩
*. The year 1945 is not involved in this case; no data has been furnished regarding nondeductible expenditures or nontaxable income for such year.↩